1
2
3
4
5
6

The Honorable Richard A. Jones

7

UNITED STATES DISTRICT COURT

8

WESTERN DISTRICT OF WASHINGTON

9

| | | |
|---|---|---|
| AMAZON.COM, INC., a Delaware Corporation, | ) ) | No. 12-01911-RAJ |
| Plaintiff, | ) ) | |
| v. | ) ) | **Noted for Hearing: November 30, 2012** |
| DANIEL POWERS, an individual, | ) ) | **ORAL ARGUMENT REQUESTED** |
| Defendant. | ) ) ) | |

10
11
12
13
14
15
16
17

**DEFENDANT DANIEL POWERS' OPPOSITION TO
AMAZON'S MOTION FOR PRELIMINARY INJUNCTION**

18
19
20
21
22
23
24
25
26

POWERS' OPPOSITION TO AMAZON'S MOTION FOR
PRELIMINARY INJUNCTION (No. 12-01911-RAJ)

BYRNES ◆ KELLER ◆ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ..................................................................................................... 1

II.  SUMMARY OF FACTS ......................................................................................... 2

    A.  Mr. Powers' Extensive Pre-Amazon Knowledge and Experience in Sales and Business Development of Cloud Computing Products in the Enterprise Market ........................................................................................................... 2

    B.  Amazon's Agreement Does Not Foreclose Mr. Powers' Work for a Cloud Competitor. ...................................................................................... 4

    C.  Google Voluntarily Imposes Restrictions on Mr. Powers' Work to Ensure Protection of Amazon Confidential Information and Trade Secrets ........................................................................................................... 5

    D.  Mr. Powers Can Perform Sales and Business Development for Cloud Products at Google Without Using AWS Confidential Information or Trade Secrets. ...................................................................................... 6

III.  ARGUMENT .......................................................................................................... 9

    A.  Procedural Status and Standards. ................................................................... 9

    B.  Amazon Cannot Show a Likelihood of Success on the Merits. ....................... 11

        1.  Amazon Has No Clear Right to Enforce Its NDA Under Washington Law ................................................................................ 11

            a.  The NDA's Nondisclosure Clause Does Not Prohibit Mr. Powers From Working for Google, and Amazon Has Not Presented Evidence of Actual or Likely Misuse of Confidential Information ......................................................... 12

            b.  The NDA Customer Nonsolicitation Clauses Do Not Prohibit Mr. Powers From Working for Google ....................... 13

            c.  Amazon's Customer Nonsolicitation Clauses Are Unreasonable .............................................................................. 14

            d.  Amazon Is Not Entitled to Equitable Relief to Reform Its Overbroad Customer Nonsolicitation Clauses ..................... 15

        2.  California Law Controls Given Its Materially Greater Interest .............. 18

        3.  Amazon Has Not Established Likely Success on Its Trade Secret Claims .............................................................................. 21

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1

C.    Amazon Has Not Demonstrated Irreparable Injury............................................22

2

D.    Equities Balance in Mr. Powers' Favor...............................................................24

3

E.    Public Policy Is Not Served by Granting Amazon Injunctive Relief................24

4

IV.    CONCLUSION ...............................................................................................................24

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# I.   __INTRODUCTION__

After decades of sales work at IBM, the last eight years involving IBM's Cloud products, in 2010 Dan Powers was recruited by Amazon to take over sales and business development for Amazon's Cloud computing products – in substance, the same job Mr. Powers last held at IBM. Amazon hired Mr. Powers specifically *because* he had extensive experience in "enterprise" sales of Cloud products, i.e., business-to-business sales, not "retail" sales.  When IBM expressed concern based on a one year noncompete provision in its agreement with Mr. Powers, Amazon argued that after no more than a few months, Mr. Powers would be able – without using IBM confidential information – to do the same job at Amazon.  At Amazon's direction, Mr. Powers started substantive work at Amazon only four and one-half months after leaving IBM, subject only to short periods during which he was not involved in bids against IBM or in soliciting IBM clients.

Now the shoe is on the other foot, and Amazon does a complete about-face.  Even though Mr. Powers worked at Amazon for only 19 months and has not worked in Cloud sales since last June, and with no evidence that he took any confidential Amazon information, Amazon claims he must avoid *all* Cloud work for 12 more months because he cannot work in "any . . . capacity supporting Google's cloud computing business" without using Amazon confidential information.

This is contrary to the evidence, to how Amazon responded to IBM's concerns, and to common sense.  Amazon does not claim that Mr. Powers took confidential information about its Cloud customers, products or strategies, nor can it (he took none).  Rather, it claims that Mr. Powers had "little experience in the cloud computing industry" before Amazon (demonstrably false), he agreed not to work for a competitor (not true), and six months after leaving Amazon, he still cannot work at Google without using unidentified confidential Amazon information he supposedly has in his head (also incorrect).  Based on conclusory statements about types of information Mr. Powers had access to, but no evidence of the actual information Amazon thinks he might still recall, Amazon seeks an 18 month preliminary injunction (i.e., not a TRO) that will extend more broadly and nearly 14 months beyond what it felt necessary to address IBM's

identical concerns.  Worse yet, Amazon asks the Court to reach into California to prevent Mr. Powers, a California resident, from working in California performing *any* Cloud work on behalf of his California employer, Google, a remedy not justified even under Washington law.

The Court should deny Amazon's motion because Amazon cannot show likely success on the merits.  It fails under Washington law because the clauses in Amazon's form agreement do not prohibit Mr. Powers from working for a competitor; rather, they only forbid disclosing confidential information and soliciting business from Amazon customers or *retail* markets, not the "enterprise" market that is Mr. Powers' forte.  The only Washington court to analyze Amazon's clauses as applied to a Cloud employee *denied* injunctive relief for the same reasons: the clauses do not prohibit working for a competitor, and the customer nonsolicit clauses only forbid seeking business from Amazon customers and retail markets.[1]  Amazon's motion also fails under California law, under which such agreements are void.  Amazon also seeks relief far beyond anything needed to address still uncorroborated concerns even if its form agreement included a general noncompete clause (it does not).  It has no evidence that Mr. Powers has or will breach the restrictions that *are* in the form, which are unenforceable in any event due to excessive scope.  Nor, in light of such overbreadth and its own hiring practices, is Amazon entitled equity to revise them as to render them enforceable.

Last, Amazon offers no proof of injury for which there is no legal remedy.  For these reasons, Amazon's motion must be denied.

## II.     SUMMARY OF FACTS

### A.     Mr. Powers' Extensive Pre-Amazon Knowledge and Experience in Sales and Business Development of Cloud Computing Products in the Enterprise Market.

In lay terms, "Cloud" computing is a means by which, rather than investing in on site

---

[1] In *Amazon.com, Inc. v. Buhr*, Amazon sought a temporary restraining order to prevent a former Cloud employee from working in a similar position for Nimbula, a Cloud start-up, based on the very same restrictions in the same form agreement.  The King County Superior Court concluded that those provisions imposed no bar on working for a Cloud competitor, and denied Amazon's TRO motion.  *See* Decl. of Keith D. Petrak in Opp'n to Amazon's Mot. for Prelim. Inj. ("Petrak Decl."), Exs. A, B at pp. 13-21, C at pp. 17-20.

POWERS' OPPOSITION TO AMAZON'S MOTION FOR
PRELIMINARY INJUNCTION (No. 12-01911-RAJ) - 2

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

hardware and software, a business purchases computing functions and capabilities as needed, from a vendor which has servers, etc., located off-site. Generally, Cloud products are not sold in retail markets, but rather in "business-to-business" markets, i.e., the "enterprise" market.[2]

One of many inaccuracies in Amazon's moving papers is that Mr. Powers knew nothing about Cloud products or enterprise markets before coming to Amazon. Before his brief stint at Amazon, Mr. Powers worked in sales and business development for decades, including nearly 20 years at IBM. Unlike Amazon, IBM has a long history in the enterprise market, in which Mr. Powers became steeped during his tenure at IBM. Mr. Powers' last eight years at IBM were devoted to enterprise sales and business development for Cloud related products. His last IBM job was with its Global Technology Services Group, managing IBM's Cloud sales team in North America. Through this and prior IBM work, Mr. Powers gained extensive knowledge and experience in all forms of Cloud computing. Powers Decl. ¶¶ 2-6 & Ex. A.

Amazon would have the Court believe that it hired someone with no knowledge of Cloud computing and put him in charge of its worldwide Cloud sales. To the contrary, Amazon hired Mr. Powers *because* of his extensive background in Cloud products, his deep knowledge of the enterprise market, and years in sales and "go-to-market" strategies in the information technology industry. As expressed by Amazon during Mr. Powers' hiring process, these were areas in which the Amazon Web Services unit ("AWS"; through which Amazon offers it Cloud product) lacked experience because its leaders came from retail units – i.e., business-to-consumer sales that are Amazon's historical roots – and had only periphery knowledge of how to compete in enterprise markets against long established players in that sector, e.g., IBM, Oracle, SAP, HP, Microsoft, Dell and others that sell IT solutions in the enterprise market. *Id.* ¶¶ 7-10.

Amazon has no property rights in Mr. Powers' extensive knowledge and experience in Cloud sales and business development in the enterprise market, whether learned in years at IBM or further honed during his brief tenure at Amazon. Mr. Powers has every right to utilize such

---

[2] Decl. of Dan Powers in Opp'n to Amazon's Mot. for Prelim. Inj. ("Powers Decl.") ¶ 3.

POWERS' OPPOSITION TO AMAZON'S MOTION FOR
PRELIMINARY INJUNCTION (No. 12-01911-RAJ) - 3

skills and knowledge even for the benefit of an AWS competitor, as long as he does not use AWS confidential information or trade secrets. He has not, nor will he, at Google.

**B.** **Amazon's Agreement Does Not Foreclose Mr. Powers' Work for a Cloud Competitor.**

In light of a noncompetition dispute with IBM when he was recruited by Amazon, Mr. Powers carefully reviewed Amazon's form agreement before signing. Powers Decl. ¶ 12 & Ex. B ("NDA"). Amazon claims that the NDA is a "noncompete" agreement that broadly precludes working for a competitor. But the NDA's only broad noncompete clause is a "moonlighting" provision that precludes competitive work *during* work at Amazon. NDA ¶ 3(a). Specifically, it prevents employees *"[d]uring* . . . [their] . . . employment with the Company"* from engaging "in any activity . . . of the same nature as, or substantively similar to, an activity or business of the Company . . . and of which the Employee has knowledge." *Id.* (emphasis added).

*But the NDA has no provision flatly precluding employees from working for a competitor after leaving Amazon.* Instead, post-employment it forbids using confidential information*:

> Accordingly, the Employee agrees that he or she shall not . . . during the term of his or her employment with the Company or at any time thereafter, . . . use . . . Confidential Information in connection with any activity or business except the business of the Company, and shall not disclose such Confidential Information to any individual . . . or . . . entity. . . .

NDA ¶ 2(b)(i). It also forbids soliciting business from certain customers, "retail" markets, and entities with which Amazon had a relationship, i.e., a former employee may not:

- Accept or solicit business from those who, as of the employee's termination, were Amazon *customers* or those with which Amazon had "engaged in serious discussions," in regard to products substantially the same as those offered by Amazon to said customer (NDA ¶ 3(c)(ii));

- Accept or solicit business from "any *retail* market sector, segment, or group that the Company [as of the termination date] has solicited, targeted, or accepted business from" or had actively targeted, in regard to products substantially the same as those offered by Amazon to such markets (NDA ¶ 3(c)(iii)) (emphasis added); or

- Enter into a "business arrangement" with *any entity with which Amazon*, prior to the employee's termination "*was involved in substantially the same business arrangement*" *or* with which Amazon had "*held discussions*" about possibly entering into such an arrangement" (NDA ¶ 3(c)(iv)) (emphases added).

Byrnes ♦ Keller ♦ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington 98104
(206) 622-2000

Even though far too broad, these provisions do not generally prohibit former employees from working for a competitor.  In reviewing the NDA before signing, Mr. Powers particularly noted that ¶ 3(c)(iii) applied only to "retail" markets, a limitation further underscored by the NDA's "clarifying example" in ¶ 3(d) which expressly identifies internet sales of various retail products (CDs, books, etc.).  As Cloud products are generally not sold to retail markets, and Mr. Powers' expertise was the enterprise market, he was comfortable that the NDA did not contain a blanket post-employment prohibition on what had been his "bread and butter" – sales of Cloud products in the enterprise market.  Powers Decl. ¶ 12.

C.    **Google Voluntarily Imposes Restrictions on Mr. Powers' Work to Ensure Protection of Amazon Confidential Information and Trade Secrets.**

Amazon asked Mr. Powers to resign in June 2012, and implies that it paid him $325,000 to reaffirm his *existing* obligations under the NDA.  Not so.  Amazon asked Mr. Powers to resign just a few months before he vested in $650,000 in Amazon stock options.  Having diligently served most of the vesting period, Mr. Powers negotiated severance of half the stock's value.  His employment formally ended on June 30, 2012, but he started paid leave on June 18, after which he had no access to Amazon confidential information.  Powers Decl. ¶¶ 14-15.

In light of the issues that arose when Mr. Powers left IBM, during his Amazon exit process he asked John Hunthausen (AWS' HR Director) to add language to the severance agreement clarifying his belief that the NDA did not preclude Mr. Powers from working for a Cloud competitor.  Mr. Hunthausen told Mr. Powers that, while Amazon would not make changes to the agreement or the NDA, Amazon did not plan to pursue noncompetition issues against him.  *Id.* ¶¶ 15-17.  Mr. Powers thus pursued a job involving sales of Google's Cloud products, moved to California and started work on September 24, 2012.  *Id.* ¶ 18.

Respectful of proprietary information of former employers, Google temporarily restricted Mr. Powers' work in certain areas to make sure he did not inadvertently use such information:

- He may not "make use of or disclose . . . or . . . retain or disclose" "[confidential, proprietary or trade secret] information" of a prior or current employer.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

- For the first six months of employment at Google (*i.e.*, until March 24, 2013), his work would "not entail participation in development of, or influencing, strategies related to product development in the areas of cloud compute, storage, database or content delivery networks products or services" other than providing "publicly available market research or customer feedback" about Google's products generated after starting work at Google; and

- For six months after leaving Amazon (*i.e.*, until December 31, 2012), he would not "participate . . . in sales or marketing to any [Amazon] customers . . . that, to the best of [his] memory, [he] had material direct contact or regarding whom [he] reviewed confidential information of [Amazon]."

*Id.* ¶ 26 & Ex. C at 1. Thus, where Mr. Powers had relationships with particular Amazon customers, he will have no role in dealing with them for six months after leaving Amazon. Whatever Mr. Powers might recall of Amazon's confidential product plans, he will have no role where such information might be relevant for nine months post-Amazon.[3]

**D.    Mr. Powers Can Perform Sales and Business Development for Cloud Products at Google Without Using AWS Confidential Information or Trade Secrets.**

Amazon offers no evidence that Mr. Powers took AWS confidential information with him (having undoubtedly scoured its servers for any such proof). There is none because Mr. Powers did not do so. Powers Decl. ¶ 16. It offers no evidence that Mr. Powers used Amazon confidential information. Rather, the nub of Amazon's motion is that Mr. Powers *cannot* do his job at Google without inadvertently misusing whatever AWS confidential information that he can still remember, nearly six months later. Without saying it out loud, Amazon asks the Court to adopt and apply the "inevitable disclosure" doctrine. No Washington appellate decision has ever endorsed this controversial and disfavored theory, and there is no basis to do so here.

Amazon itself rejects this doctrine each time it hires from *its* Cloud competitors, e.g., Tal Saraf and Alyssa Henry (from Microsoft), Airel Kelman (from Salesforce.com), and Raj Gulabani (from Google), to name a few. *Id.* ¶ 28. Amazon clearly believes that *its* employees can perform similar functions without using a prior employer's confidential information trusting its employees to abide by contractual promises not to do so. NDA ¶ 5. Mr. Powers, of course,

---

[3] Shortly after Mr. Powers started work at Google, Amazon protested and Google imposed even greater restriction on Mr. Powers' work while the parties tried to reach a resolution. Those restrictions will remain in place until the Court rules on this motion or December 31, 2012, whichever occurs first. Petrak Decl., Ex. D.

Byrnes ♦ Keller ♦ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington  98104
(206) 622-2000

made similar promises to Google.  Powers Decl., Exs. C & D.

The circumstances of Mr. Powers' particular work compel no different outcome; indeed, Amazon's recruitment of Mr. Powers from IBM proves the point.  Mr. Powers had access to the same types of information at IBM when he resigned to become AWS' Vice President of Sales that Amazon now asserts as the basis for this motion.  IBM protested because unlike here, Mr. Powers worked more than eight years in Cloud at IBM, and had signed a true noncompetition agreement lasting one year after leaving IBM.  Amazon argued that Mr. Powers could do the AWS job without using IBM confidential information, and later directed Mr. Powers to take over AWS sales and business development on December 1, 2010 – a mere four and one-half months after leaving IBM.[4]  Amazon limited Mr. Powers' work in only three respects:  he could not use IBM proprietary information, be involved in sales against IBM until January 2011 (five and one-half months after leaving IBM), or solicit IBM customers until July 2011 (one year after leaving IBM).  *Id.* ¶ 11.  Here, Google has already put even broader restrictions into place:

- Google and Mr. Powers contractually agreed that he would not use Amazon proprietary information at Google;

- Mr. Powers did not start work at Google until September 24, 2012 (three months after he went on leave at Amazon and had no more access to AWS confidential information);

- He cannot recruit from Amazon until June 30, 2013 (12 ½ months after going on leave);

- He cannot be involved in Cloud product development strategies until March 24, 2013 (more than nine months after going on leave); *

- He cannot be involved in soliciting certain Amazon customers until December 31, 2012 (six ½ months after going on leave);*

- He cannot be involved in sales of specified Google Cloud products to *anyone* until December 31, 2012 (six ½ months after going on leave);*

- He cannot speak to press, analysts or at conferences until December 31, 2012 (six ½ months after going on leave); * and

---

[4] Agreements between Amazon and IBM, or between Amazon and other Cloud competitors, related to migration of Cloud employees to or from Amazon, was discovery that Mr. Powers requested in return for agreeing to Amazon's request for expedited discovery, and which prompted Amazon to abandon that request.  *See infra* § III.A.

POWERS' OPPOSITION TO AMAZON'S MOTION FOR
PRELIMINARY INJUNCTION (No. 12-01911-RAJ) - 7

Byrnes ◆ Keller ◆ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

- His title cannot refer to Cloud products until December 31, 2012 (six ½ months after going on leave).*[5]

The reasons Mr. Powers' move from IBM to Amazon posed no risk to IBM confidential information are the same reasons his move from Amazon to Google poses no risk to Amazon confidential information. While general knowledge of sales of Cloud products in the enterprise market will be very useful to him, he simply has no need to use *confidential* information about AWS customers, products or strategies that he might still remember. Cloud computing is well defined in the marketplace, and is a fairly simple business involving virtual servers and storage. Anyone with IT experience and proper capital investment can enter and compete in this business. AWS' pricing is publicly available on its website. The strengths and weaknesses of its products are apparent to any competitor. Competition is based on differentiation between competitors in regard to product features, scale, partner network, price, reliability, and existing customers. These concepts are not unique to the Cloud market; Mr. Powers learned them long ago, and none require knowledge of a competitor's confidential information. *Id.* ¶¶ 19-22.

To understand the point, consider Amazon's Elastic Beanstalk product, which Amazon contends competes with Google's App Engine product. Even if true (it is very debatable), it does not follow that Mr. Powers *must* use *confidential* information about Elastic Beanstalk he might still recall to sell App Engine as a competing product. Quite the contrary. Amazon's motion is devoid of actual evidence of confidential Elastic Beanstalk information Mr. Powers had access to, much less that he would somehow still remember. But the features, strengths and weaknesses of Elastic Beanstalk are apparent to any competitor, just as features, strengths and weaknesses of the latest BMW are known to Mercedes and other BMW competitors. To the extent Elastic Beanstalk competes with App Engine, Google will compete against it like any other competitor: identifying its flaws from public information and comparing it against better attributes of App Engine. Just like an executive who never worked at Amazon, Mr. Powers can easily sell App

---

[5] Powers Decl., Ex. C; Petrak Decl., Ex. D. Items marked with an asterisk were put in place at Amazon's request.

POWERS' OPPOSITION TO AMAZON'S MOTION FOR
PRELIMINARY INJUNCTION (No. 12-01911-RAJ) - 8

1

2    Engine against Elastic Beanstalk without using AWS confidential information.  *Id.* ¶¶ 23-24.

3            Moreover, even if Mr. Powers could recall specific product plans as such plans existed

4    when he went on leave – he does not[6] – such information has long since grown stale.  Due to his

5    impending departure, Mr. Powers did not participate in AWS' 2012 mid-year meetings, at which

6    management set its plans for the next year.  What little Mr. Powers might recall about AWS'

7    plans as of when he went on leave, that is not already public, was competitively worthless as

8    soon as the 2012 meetings started in June, much less now.  Powers Decl. ¶ 15.

9            Amazon's caterwauling that Mr. Powers was directly involved with Amazon's customers

10   (Mot. at 6:1-11) is also overstated.  Mr. Powers took no customer lists or information with him

11   upon departure.  Given his position, he was largely uninvolved in direct sales efforts other than

12   to roughly 33 accounts for larger, Fortune 2000 AWS customers.  Most significant customers

13   and partners are listed on AWS' website;[7] indeed, of the accounts with which Mr. Powers had

14   particular familiarity, 29 are listed as AWS customers on its website.  Others can be identified

15   via simple web searches, on-line press reports, customer websites touting use of AWS, and

16   public AWS conference presentations.  Customer identities are hardly confidential, and

17   customers are free to reveal to anyone their Cloud usage, expenditures, needs, and satisfaction

18   (or dissatisfaction) with Amazon.  Powers Decl. ¶¶ 20-21.

19                              **III.    ARGUMENT**

20   A.    **Procedural Status and Standards.**

21           The procedural posture of this motion is important, given the conclusory record on which

22   Amazon seeks such extraordinary relief, devoid of actual evidence of confidential information to

23   ---

[6] For example, Mr. Powers received AWS' weekly Web Services Metrics Deck, "colossal documents that one
would need to spend two-three hours a week pouring over in order to retain any information of substance."  Mr.
24   Powers did not review them because it was not necessary for his work and he was very busy with his primary
responsibilities of building out the sales team and closing business.  Powers Decl. ¶ 25.  Had Amazon elected to
25   offer into evidence even one such document (Mr. Powers has no copies), this point would be abundantly clear.
[7] 590 are identified via AWS' Customer Applications:  http://aws.amazon.com/customerapps; more than 300 via
Reference Customers & Use Cases:  https://aws.amazon.com/solutions/case-studies/; and more than 1000 via AWS
26   Partners: https://aws.amazon.com/solution-providers.  Powers Decl. ¶ 20.

POWERS' OPPOSITION TO AMAZON'S MOTION FOR
PRELIMINARY INJUNCTION (No. 12-01911-RAJ) - 9

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1

2    which Mr. Powers had access at Amazon.

3        Amazon seeks an 18 month injunction (not temporary restraining order) precluding Mr.

4    Powers from working on any Cloud business, despite offering no evidence of wrongdoing and

5    despite not allowing Mr. Powers the discovery he requested. Indeed, after Mr. Powers removed

6    this case from Superior Court, he offered to stipulate to Amazon's request to expedite discovery,

7    if it allowed reciprocal discovery of the specific confidential information Amazon claimed he

8    had or might misuse,[8] his personnel file, internal documents about his hire from IBM and related

9    agreements, and agreements related to other Cloud employees who migrated between Amazon

10   and its competitors. Petrak Decl., Ex. E. Upon seeing what Mr. Powers wanted, Amazon was

11   "not interested in further negotiations about discovery," moved for a preliminary injunction, then

12   offered to revisit the discovery issue if Mr. Powers would "move off some of the positions" he'd

13   taken in requesting reciprocal discovery. *Id.* Exs. F, G.

14       Amazon thus seeks a preliminary injunction knowing that Mr. Powers cannot obtain the

15   discovery he wanted under the federal rules before this motion will be decided. It seeks not a

16   temporary remedy pending discovery on the merits, but rather a preliminary injunction on the

17   barest record and without discovery, for a duration that would render discovery pointless because

18   the issue would likely be moot by the time the Court revisits the issue. The Court may not grant

19   such a draconian remedy, absent discovery and an evidentiary hearing.

20   _____

[8] Ample authority recognizes that vague claims of theft or misuse of confidential information are often strategic
21   ploys, such that plaintiffs must identify the confidential information at issue with particularity before being allowed
     discovery. *See* Charles T. Graves & Brian D. Range, *Identification of Trade Secret Claims in Litigation: Solutions
22   for a Ubiquitous Dispute,* Nw. J. Tech. & Intellectual Prop., Vol. 5, No. 1 (2006) at p. 68; *Stoncor Group, Inc. v.
     Campton,* No. C05-1225JLR, 2006 WL 314336, at *1-2 (W.D. Wash. Feb. 7, 2006); *Advanced Modular Sputtering,
23   Inc. v. Superior Court,* 132 Cal. App. 4th 826, 835, 33 Cal. Rptr. 3d 901 (2005); *Whyte v. Schlage Lock Co.,* 125
     Cal. Rptr. 2d 277, 268 (Cal. Ct. App. 2002) (mere reference to "information about [Schlage's] new products" was
24   too broad and did not differentiate between truly secret information and new product information which had been
     publicly disclosed); *Unicure v. Thurman,* 97 F.R.D. 7, 10, 14 (W.D.N.Y. 1982) (generic and conclusory phrases and
25   generalized reference to ratio of ingredients deemed "evasive, ambiguous and incomplete"); *Cromaglass Corp. v.
     Ferm,* 344 F. Supp. 924, 928 (M.D. Pa. 1972); *Xerox Corp. v. Int'l Bus. Machs. Corp.,* 64 F.R.D. 367, 370-72
26   (S.D.N.Y. 1974); *Imax Corp. v. Cinema Techs., Inc.,* 152 F.3d 1161, 1167 (9th Cir. 1998); *Savor, Inc. v. FMR
     Corp.,* No. Civ. A. 00C-10-149JRS, 2004 WL 1965869, at *6 (Del. Super. Ct. July 15, 2004); *Combined Metals of
     Chicago, Ltd. v. Airtek, Inc.,* 985 F. Supp. 827 (N.D. Ill. 1997); *Del Monte Fresh Produce Co. v. Dole Food Co.,*
     148 F. Supp. 2d 1322, 1325 (S.D. Fla. 2001).

POWERS' OPPOSITION TO AMAZON'S MOTION FOR
PRELIMINARY INJUNCTION (No. 12-01911-RAJ) - 10

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Ultimately, Amazon is not entitled even to a temporary restraining order based on this record. Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). In order to obtain a TRO or a preliminary injunction, Amazon must establish: (1) likelihood of success on the merits; (2) likelihood of irreparable harm before a decision on the merits can be rendered; (3) the balance of equities tips in Amazon's favor; and (4) an injunction is in the public interest. *Id.* at 20. A party can also satisfy the first and third elements by raising serious questions going to the merits of its case and a balance of hardships that tips sharply in its favor. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). Amazon's record fails to meet this burden.

**B.    Amazon Cannot Show a Likelihood of Success on the Merits.**

Amazon assumes that Washington law controls based on a choice of law clause in the NDA. Mr. Powers contends that California law controls. But choice of law is no issue if the outcome is the same under Washington *or* California law, as is the case here.

**1.    Amazon Has No Clear Right to Enforce Its NDA Under Washington Law.**

Noncompetition agreements are enforceable in Washington only to the extent reasonable. *Perry v. Moran*, 109 Wn.2d 691, 748 P.2d 224 (1987). The court must consider three factors in determining if a restraint is reasonable: (1) is the restraint necessary to protect a legitimately protectable interest of the employer; (2) does it impose a greater restraint than necessary on the employee to protect the interest in question; and (3) is the degree of injury to the public such loss of the service and skill of the employee as to warrant nonenforcement. *Knight, Vale & Gregory v. McDaniel*, 37 Wn. App. 366, 369, 680 P.2d 448 (1984). Whether a noncompete agreement is reasonable is a matter of law to be decided by a court absent disputed facts. *Id.* at 368-69.

Agreements cannot be more restrictive than is reasonably necessary to protect the legitimate business interests of employers. *Id.* at 369; *Racine v. Bender,* 141 Wash. 606, 612, 252 P. 115 (1927). If a restriction is unreasonable, a court may exercise its equitable powers in

POWERS' OPPOSITION TO AMAZON'S MOTION FOR
PRELIMINARY INJUNCTION (No. 12-01911-RAJ) - 11

1    appropriate circumstances to reform the offending clause by rewriting it as to enforce it "by

2    injunction to the extent necessary to accomplish the basic purpose of the contract insofar as such

3    contract is reasonable." *Wood v. May*, 73 Wn.2d 307, 315, 438 P.2d 587 (1968). But a court

4    should not grant such equity if the "circumstances indicate bad faith or deliberate overreaching"

5    on the part of the employer. *Cf. Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.*, 968

6    F.2d 1463 (1st Cir. 1992); *Durapin, Inc. v. Am. Prods., Inc.*, 559 A.2d 1051, 1058 (R.I. 1989).

7        Amazon's motion fails because it cannot show likely success under these standards.

8            a.    **The NDA's Nondisclosure Clause Does Not Prohibit Mr. Powers**
                    **From Working for Google, and Amazon Has Not Presented Evidence**
9                   **of Actual or Likely Misuse of Confidential Information.**

10       Based on ¶¶ 2(b)(i), 3(c)(ii), 3(c)(iii), and 3(c)(iv) of the NDA, Amazon contends that it

11   has the right to prevent Mr. Powers from competing with Amazon by working at Google in any

12   aspect related to Cloud products. None are so broad.

13       Paragraph 2(b)(i) is a *nondisclosure* clause that only precludes disclosure of confidential

14   information, not working for a competitor. Mr. Powers has already agreed with Google not to

15   use Amazon confidential information on Google's behalf. Amazon offers no evidence that Mr.

16   Powers in fact misappropriated any AWS confidential information. Its entire case is based on

17   the "inevitable disclosure" doctrine, but it offers only conclusory testimony that Mr. Powers had

18   access to unspecified plans, strategies, or "other information," no legal precedent for applying

19   this disfavored theory in either the trade secret or breach of contract contexts, nor the actual

20   documents by which to test the claim that he cannot now ignore what he remembers of them.[9]

21       As revealed by Amazon's direction that Mr. Powers assume his job responsibilities with

22   minimal restrictions only four months after leaving IBM, and as set forth in greater detail in Mr.

23   Powers' declaration, Amazon's "inevitable disclosure" contention is hotly contested. Amazon

24   has not proven a likelihood of success on this basis, either legally or factually, on this record.

25

26   _____

[9] Amazon cannot address this deficiency by submitting such evidence in reply. Such conduct would be fundamentally unfair and deprive Mr. Powers of the opportunity to challenge such evidence as a basis for injunctive relief.

POWERS' OPPOSITION TO AMAZON'S MOTION FOR
PRELIMINARY INJUNCTION (No. 12-01911-RAJ) - 12

**b.    The NDA Customer Nonsolicitation Clauses Do Not Prohibit Mr. Powers From Working for Google.**

The remaining sections on which Amazon relies – ¶¶ 3(c)(ii), 3(c)(iii), 3(c)(iv) – are not nearly so broad as Amazon implies.  They do not forbid all competition; they are customer nonsolicitation clauses that do not justify a blanket injunction precluding all Cloud work.

For example, ¶ 3(c)(ii) prohibits Mr. Powers from accepting business from existing or certain prospective Amazon customers.  Similarly, ¶ 3(c)(iv) prevents Mr. Powers from entering into a "business relationship" with companies with which Amazon has a similar relationship.  As written these clauses do not prohibit Mr. Powers from soliciting business from Google's current customers or partners, or customers or partners that Amazon has not yet approached.  Thus, Amazon is not entitled to an injunction of that scope based on these clauses.

Similarly, ¶ 3(c)(iii) prohibits Mr. Powers from soliciting business from any existing or certain prospective _retail_ markets served or targeted by Amazon.  But AWS's Cloud products are not sold to _retail_ markets, nor does this clause prohibit soliciting business from non-retail, e.g., enterprise markets, where Mr. Powers operates.  The clause is presumably a hold-over from the days in which Amazon was an online retailer whose biggest concern was bricks-and-mortar retailers hiring Amazon employees to help establish a competing online presence.  But whatever the genesis of this clause, the Court may not expand it beyond the scope as written to encompass the enterprise market.  This was the very basis on which the King County court in _Buhr_ denied Amazon's only other request for injunctive relief in regard to a former Cloud employee.

If Amazon reads these clauses differently, then such ambiguities must be resolved _against_ Amazon in construing its adhesive form.  *See generally Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co.*, 134 Wn.2d 413, 428, 951 P.2d 250 (1998) (ambiguous terms construed against drafter); *Zuver v. Airtouch Commc'ns, Inc.*, 153 Wn.2d 293, 103 P.3d 753 (2004) (discussing qualities of contracts of adhesion).  Such ambiguities cannot support an injunction where Amazon bears the burden of proving likely success on the merits.

POWERS' OPPOSITION TO AMAZON'S MOTION FOR
PRELIMINARY INJUNCTION (No. 12-01911-RAJ) - 13

1

### c.    Amazon's Customer Nonsolicitation Clauses Are Unreasonable.

2          Nor is Amazon entitled to injunctive relief based on the customer nonsolicitation clauses.

3    They impose far greater restraints than are necessary to serve any *legitimately* protected interests

4    of Amazon.  Even where an employee has agreed to an actual noncompetition clause – a

5    situation that does not exist here – such clauses may not be used to shield the employer from

6    legitimate competition.  *See, e.g., Labriola v. Pollard Group, Inc.*, 152 Wn.2d 828, 845, 100 P.3d

7    791 (2004).[10]  Amazon does not own its customers.  The only proper use of a post-employment

8    restraint is to prevent, for a time, the competitive use of information or relationships that are

9    unique to the former employer.  *Perry v. Moran*, 109 Wn.2d at 702; *Copier Specialists, Inc. v.*

10   *Gillen*, 76 Wn. App. 771, 774, 887 P.2d 919 (1995).  An employer has no protectable interest in

11   preventing competition generally, and therefore may not prevent competitive conduct that does

12   not make use of unique or specialized client relationships or confidential information of the

13   employer.  *Perry*, 109 Wn.2d at 702; *accord Labriola*, 152 Wn.2d at 847 (Madsen J. concurring)

14   (discussing case law).  Nor may an employer prevent a former employee from making use of the

15   employee's own prior experience, skills, or knowledge not unique to the employer, or even skill

16   acquired *during employment with the former employer*.  *See Perry*, 109 Wn.2d at 702; *Copier*

17   *Specialists*, 76 Wn. App. at 774.

18          The NDA's non-solicitation clauses exceed any legitimate scope because they are not

19   defined by reference to customers with whom the employee had material contact, or knowledge

20   of *confidential* information.  Rather, as written they preclude an employee from soliciting

21   business from *any* of Amazon's millions of customers, or *any* of thousands of partners, or *any* of

22   thousands of retail markets it does or plans to serve, *regardless* of the employee's prior contact

23
[10] In *Labriola*, Justice Madsen, in concurrence, held that a restrictive covenant that extended three years and 75
24   miles of the employer's business was unenforceable.  (The majority never reached the issue, concluding that the
     non-compete agreement lacked consideration.)  Justice Madsen noted that employers "may not unreasonably restrict
25   the freedom of current or former employees to earn a living" and that "[t]he agreement at issue here is unreasonable
     because it bars Labriola from working in his field of expertise even where he takes no unfair advantage of his former
26   employer."  152 Wn.2d at 847.  She concluded that by "prohibiting Labriola from gaining lawful post termination
     employment in such broad-sweeping terms, the agreement represents an unfair attempt to . . . secure its business
     against legitimate competition."  *Id.*

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1   with or knowledge of the customer or partner or retail market.  They extend, arbitrarily, for 18

2   months.  Amazon does not explain, much less justify, how it arrived at the number or why such

3   duration is needed to protect customer relationships from *unfair* competition.  If Amazon is

4   worried that a former employee might poach an important customer, it surely does not need 18

5   months for a new account representative to solidify that relationship.

6          Restraints of such staggering scope limit competition far more broadly than necessary to

7   serve any *legitimate* interest of Amazon; to the contrary, they function only to protect Amazon

8   from legitimate competition.  *See, e.g., A Place for Mom, Inc. v. Leonhardt,* No. C06-457P, 2006

9   WL 2263337 (W.D. Wash. Aug. 4, 2006).  There, following *Labriola,* and notwithstanding that

10  the employee had access to proprietary information, the Court found the restraint to be greater

11  than necessary to protect the company's interest.  "Plaintiff has the right to prevent Defendant

12  from making use of any proprietary information he learned during his employment, but the

13  agreement goes far beyond that to prohibit work on 'any . . . services that are competitive' with

14  Plaintiff's services."  2006 WL 2263337, at *3.  Thus, the Court refused to enjoin the employee

15  from working for the competitor, granting only a limited injunction precluding the use of "any

16  information which Plaintiff can establish as proprietary," and soliciting business from those with

17  whom he developed a business relationship while working for the prior employer.  *Id* at *3, 5.[11]

18          d.    <u>**Amazon Is Not Entitled to Equitable Relief to Reform Its Overbroad**</u>
19             <u>**Customer Nonsolicitation Clauses.**</u>

20          Amazon's request for a less restrictive injunction not to solicit its customers should be

21  rejected, because even the Court should not exercise its equitable powers under *Wood v. May* to

22  reform the customer nonsolicitation clauses as to render them enforceable.

23          In light of *Labriola*, Washington should and will revisit *Wood v. May's* approach to

---

[11]   In two cases Amazon cites, the court refused to enforce the non-compete agreement as written.  *See Copier Specialists, Inc. v. Gillen,* 76 Wn. App. at 774, and *Wood v. May,* 73 Wn.2d at 309-10.  In three other cases Amazon cites, the court merely prevented the employee from soliciting the former employer's existing clients.  *See Perry v. Moran,* 109 Wn.2d at 698; *Knight, Vale & Gregory,* 37 Wn. App. at 369-71; and *Racine v. Bender,* 141 Wash. at 610-15.  One of the cases cited involved Oregon, not Washington law.  *Nike, Inc. v. McCarthy,* 379 F.3d 576, 585 (9th Cir. 2004).

POWERS' OPPOSITION TO AMAZON'S MOTION FOR
PRELIMINARY INJUNCTION (No. 12-01911-RAJ) - 15

Byrnes ◆ Keller ◆ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

reforming unreasonable noncompete clauses to allow limited enforcement.  The *Wood* Court rejected the "blue pencil" method[12] in favor of the more forgiving "reformation" approach, as it saw "no reason why effect should not be given to a restrictive promise indivisible in terms, to the extent that it is lawful." *Wood*, 73 Wn.2d at 314 (citing 5 *Williston, Contracts* § 1660 (rev. ed. 1937)).  Reformation may have made sense in 1968 in a dispute between a master horseshoer and his apprentice, but it does not in regard to form agreements that large employers compel tens of thousands of employees to sign as a condition of employment.  The problem with "reformation" and "blue pencil" methods is they allow employers to overreach with impunity, with harmful effects on employee mobility.  The *in terrorem* effect of overbroad provisions is well recognized:

> For every covenant that finds its way to court, there are thousands which exercise an *in terrorem* effect on employees who respect their contractual obligations and on competitors who fear legal complications if they employ a covenantor, or who are anxious to maintain gentlemanly relations with their competitors.  Thus, the mobility of untold numbers of employees is restricted by the intimidation of restrictions whose severity no court would sanction.  If severance is generally applied, employers can fashion truly ominous covenants with confidence that they will be pared down and enforced when the facts of a particular case are not unreasonable.  This smacks of having one's employee's cake, and eating it too.

*Richard P. Rita Pers. Servs., Inc. v. Kot*, 191 S.E.2d 79, 81 (Ga. 1972) (citing Harlan M. Blake, 73 H. L. R. 625, 682-83 (1960)).[13]  Numerous scholars document the negative impact on a regional basis due to stifling employee mobility via restrictive covenants.[14]  Other approaches

---

[12] The "blue pencil" approach is slightly more restrictive than "reformation," by which a court severs unreasonable clauses if they are divisible from other terms, and enforces remaining terms to the extent they are reasonable and remain grammatically coherent after excising unreasonable provisions. *See, e.g., Licocci v. Cardinal Assocs.*, 445 N.E.2d 556, 561 (Ind. 1983) (if covenant is clearly separated into parts and some are reasonable and others are not, contract may be held divisible).  But a court may not modify unreasonable terms so as to render them reasonable, and thus enforceable. *Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1286 (Ariz. 1999).

[13] *See also Reddy v. Cmty. Health Found. of Man.*, 298 S.E.2d 906, 916 (W.Va. 1982) (decrying use of overly broad provisions "where savage covenants are included in employment contracts so that their overbreadth operates, by *in terrorem* effect, to subjugate employees unaware of the tentative nature of such a covenant"); *Valley Med. Specialists*, 982 P.2d at 1280, 1286 ("[E]mployers may therefore create ominous covenants, knowing that if the words are challenged, courts will modify the agreement to make it enforceable. . . . For every agreement that makes its way to court, many more do not.  Thus, the words of the covenant have an *in terrorem* effect on departing employees.").

[14] *See generally* Ronald J. Gilson, *The Legal Infrastructure of High Technology Industrial Districts:  Silicon Valley, Route 128, and Covenants Not to Compete*, 74 N.Y.U. L. R. 575 (1999); Alan Hyde, *Should Noncompetes Be*

---

POWERS' OPPOSITION TO AMAZON'S MOTION FOR
PRELIMINARY INJUNCTION (No. 12-01911-RAJ) - 16

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

exist that give employers more skin in the game for drafting unreasonable clauses.[15]

But the Court need not reach this issue; the equitable reformation Amazon needs here to render its customer nonsolicitation clauses enforceable is not justified.  Jurisdictions that utilize the "blue pencil" or "reformation" methods recognize that revision is not required, and that a court should look to the good faith of the employer, or the overall fairness of the restraint as drafted, in determining whether to enforce on a limited basis an otherwise unreasonable clause.[16] Courts should also consider whether modifying an agreement may actually discourage "the narrow and precise draftsmanship which should be reflected" in such agreements.  *Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*, 719 N.E.2d 1141, 1149 (Ill. 1999) (court should not modify covenant if degree of unreasonableness renders it unfair and requires drastic modifications tantamount to fashioning new agreement).[17]

Amazon has not demonstrated grounds to justify equitable reformation of its obscenely overbroad customer nonsolicit clauses.  Their staggering scope reveals a failure to even *attempt* to craft a narrowly tailored covenant.  Amazon apparently could not even be troubled to modify its form once its business expanded beyond retail markets; instead it asks the Court to expand what Amazon wrote by ignoring the term "retail" and the "clarifying example."  Such

---

*Enforced?  New Empirical Evidence Reveals The Economic Harm of Non-Compete Covenants,* REG. (2011); Alan Hyde, *The Wealth of Shared Information:  Silicon Valley's High-Velocity Labor Market, Endogenous Economic Growth, and the Law of Trade Secrets,* RUTGERS UNIV. (2003); Matt Marx, Jasjit Singh & Lee Fleming, *Regional Disadvantage?  Non-Compete Agreements and Brain Drain,* H. B. S. (2011); Viva R. Moffat, *The Wrong Tool For the Job:  The IP Problem With Noncompetition Agreements,* 52 W. & M. L. R. 873 (2010); Charles T. Graves, *Analyzing the Non-Competition Covenant as a Category of Intellectual Property Regulation,* 3 H. S. & T. L.J. 69 (2011).

[15] *See, e.g., Allied Informatics, Inc. v. Yeruva,* 554 S.E.2d 550, 553 (Ga. Ct. App. 2001) (applying "red pencil" approach: restrictive covenant is enforced if reasonable, but voided entirely if any part is unenforceable).

[16] *See, e.g., Klick v. Crosstown State Bank of Ham Lake, Inc.,* 372 N.W.2d 85, 88-89. (Minn. Ct. App. 1985) (court has power and discretion to modify an employment contract or not, depending on equitable considerations and particular facts of case); *Arpac Corp. v. Murray,* 589 N.E.2d 640 (Ill. Ct. App. 1992) (fairness of restraint initially imposed is relevant consideration for court in deciding whether to modify restraining provision).

[17] *See also Telxon Corp. v. Hoffman,* 720 F.Supp. 657, 666 (N.D. Ill. 1989) (declined to "blue-pencil" restrictive covenant because it was overly broad as written and employers must draft covenants narrowly tailored to serve their individual needs); *Roberge v. Qualitek Int'l, Inc.,* No. 01C5509, 2002 WL 109360, at *7 (N.D. Ill. Jan. 28, 2002) (declined to exercise discretion to "blue-pencil" restrictive covenant because it was unfair as executed and because declining to do so would encourage employers to write contracts that are more narrowly tailored); *Trailer Leasing Co. v. Assocs. Commercial Corp.,* No. 96C2305, 1996 WL 392135, at *4 (N.D. Ill. July 10, 1996) (same).

POWERS' OPPOSITION TO AMAZON'S MOTION FOR
PRELIMINARY INJUNCTION (No. 12-01911-RAJ) - 17

1    overreaching and unfairness should be discouraged.  Finally, as a company that regularly hires

2    Cloud employees from its competitors with minimal restrictions, Amazon deserves no equity to

3    stop a competitor from hiring *Amazon's* employees.  *Labriola*, 152 Wn.2d at 845-47.

4        **2.    California Law Controls Given Its Materially Greater Interest.**

5        If the Court determines, notwithstanding the foregoing, that Amazon has shown likely

6    success under Washington law, the Court must engage in a conflict of law analysis before any

7    injunction can issue.  A federal court sitting in diversity looks to the forum's choice of law rules

8    to determine the controlling substantive law.  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589

9    (9th Cir. 2012).  Where a choice of law provision exists, Washington applies the standards of

10   *Restatement (Second) Conflict of Laws* § 187 in determining the provision's enforceability.

11   *Schnall v. AT&T Wireless Servs.*, *Inc.*, 171 Wn.2d 260, 266-67, 259 P.3d. 129 (2011).  Under §

12   187, a court should disregard a contract's choice of law clause if application of the selected law

13   would be contrary to a fundamental policy of a state which has a materially greater interest than

14   the chosen state in the particular issue, and which under *Restatement* § 188 would be the

15   controlling state law absent an effective choice of law clause.  *Id*. at 267 (citing *Restatement* §

16   187(2)(b).  The NDA's choice of law clause must be disregarded because applying Washington

17   law is contrary to the fundamental public policy of California, where Mr. Powers now lives and

18   works for Google.  California law controls, which forbids enforcement of Amazon's restrictive

19   covenants, or injunctive relief based on the "inevitable disclosure" doctrine.

20       California's Materially Greater Interest.  Under § 187, California law controls because

21   California has a materially greater interest in the matter than Washington at this point.  Amazon

22   seeks an injunction that will have its sole impact in California, by preventing a California

23   resident from working in California for a California company, based on contractual clauses and

24   legal doctrines that contradict fundamental California law and policy.  Noncompetition contracts

25   are void under California law which provides that "*every* contract by which anyone is restrained

26   from engaging in a lawful profession, trade, or business of any kind is to that extent void."  Cal.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

Bus. & Prof. Code § 16600 (emphasis added). Section 16600 "protects Californians and ensures 'that every citizen shall retain the right to pursue *any* lawful employment and enterprise of their choice.'" *Edwards v. Arthur Andersen LLP*, 81 Cal. Rptr. 3d 282, 291 (Cal. 2008) (emphasis added). In California *any* contract which restrains an employee from working in his chosen job (whether competitive or not) is void. *Dowell v. Biosense Webster, Inc.*, 102 Cal. Rptr. 3d 1, 11 (Cal. Ct. App. 2009); *Thompson v. Impaxx, Inc.*, 7 Cal. Rptr. 3d 427, 429-32 (Cal. Ct. App. 2003).[18] There is no doubt that § 16600 is fundamental California public policy. California courts have "consistently affirmed that section 16600 evinces a settled legislative policy in favor of open competition and employee mobility." *Edwards*, 81 Cal. Rptr. 3d at 290-91; *see also Alliance Payment Sys., Inc. v. Walczer*, 61 Cal. Rptr. 3d 789, 800 (Cal. Ct. App. 2007) (§ 16600's prohibition of contracts in restraint of trade codifies "deeply rooted public policy favoring open competition").

California law also flatly precludes Amazon's quest for an injunction based on an "inevitable disclosure" theory, i.e., its speculation that in the future, it will be impossible for Mr. Powers not to misuse its trade secrets. As noted above, Amazon does not – and cannot – allege facts that Mr. Powers has actually used AWS trade secrets; it claims only that Mr. Powers will necessarily have to use trade secrets in his job at Google. Although Washington has yet to consider the issue, California has long rejected the "inevitable disclosure" theory. *See Continental Car-Na-Var Corp. v. Moseley*, 148 P.2d 9, 10 (Cal. 1942), reversing injunction based on former employer's speculation); *Whyte v. Schlage Lock Co.*, 125 Cal. Rptr. 2d at 294 ("inevitable disclosure" injunctions are impermissible in California).[19] The reason California

---

[18] Amazon cannot avoid this law by arguing that a term does not foreclose competition entirely, or that its restriction is "reasonable"; California also prohibits so-called "partial" or "narrow" restraints and prohibits all such restraints even if they are reasonable. *Edwards*, 81 Cal. Rptr. 3d at 292; *Impaxx*, 7 Cal. Rptr. 3d at 428-29.

[19] *See also GlobeSpan, Inc. v. O'Neill*, 151 F. Supp. 2d 1229, 1235 (C.D. Cal. 2001) (rejecting "inevitable disclosure"); *Del Monte Fresh Produce Co. v. Dole Food Co.,* 148 F. Supp. 2d 1326, 1338 (S.D. Fla. 2001) ("inevitable disclosure" is not recognized in California); *Bayer Corp. v. Roche Molecular Sys., Inc.*, 72 F. Supp. 2d 1111, 1120 (N.D. Cal. 1999) (same); *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 707 F. Supp. 1170, 1177 (C.D. Cal. 1989) (trade secret claim against former employees who joined competitor, worked in same areas as they had for the former employer, and quickly released an improved product rejected as "speculation"); *Mayview Corp v. Rodstein*, 480 F.2d 714, 718 n.7 (9th Cir. 1973) (applying California law and reversing injunction based only on "opportunity" that defendant might disclose trade secrets).

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

law rejects "inevitable disclosure" is that it is a court-created means of injecting non-competition terms into the parties' contract. *Id.* at 292-93 ("inevitable disclosure" allows plaintiffs to ask courts to create after-the-fact contract terms the parties never bargained for, amounting to a non-competition covenant).[20]  Nor under California law may a court issue "do no harm" injunctions just because a plaintiff fears future misuse.[21]  California's policy forbidding claims based on "inevitable disclosure" of trade secrets applies with equal force to claims for breach of contractual nondisclosure clauses; if an overt noncompete clause violates public policy, so would a claim for breach of a nondisclosure clause under a theory that renders such clause the functional equivalent of a noncompete clause.

California's overriding interests when an out-of-state employer seeks to stop a California company from recruiting a nonresident to work in California are best exemplified in *Application Group, Inc. v. Hunter Group, Inc.*, 72 Cal. Rptr. 2d 73 (Cal. Ct. App. 1998), where a Maryland company sought to enforce a Maryland noncompete agreement to prevent a Maryland resident from moving to California to work for a California competitor.  The court analyzed the choice of law issue under *Restatement* § 187(2)(b), held that the noncompetition clause was unenforceable under Cal. Bus. & Prof. Code § 16600 *and* § 17200 (precluding unfair competition in the form of practices prohibited by law), and that the California company could sue the Maryland company under § 17200, et seq., for trying to extend the Maryland agreement into California.

California's interest in preventing enforcement of noncompetition agreements against its citizens thus trumps Washington's interest in, e.g., supporting the expectation of the parties, particularly when Washington has expressed no *policy* preference to the contrary, and Amazon had no reasonable *expectation* of enforcement in California.  *See, e.g., digEcor v. e.Digital Corp.*, No. 2:06-cv-437cw, 2009 WL 706888 (D. Utah 2009); *but see CH2O, Inc. v. Bernier*, No. C-11-

---

[20] Speculative accusations of future, unavoidable misuse of proprietary information are in fact *sanctionable* despite reasonable suspicions of misuse.  *FLIR Sys., Inc. v. Parrish*, 95 Cal. Rptr. 3d 307, 314, 315 n.4 (Cal. Ct. App. 2009).
[21] *See Moseley*, 148 P.2d at 12 (reversing a do-no-harm injunction that a defendant should not misuse confidential information); *FLIR Sys.*, 95 Cal. Rptr. 3d at 313 (rejecting do-no-harm order).

POWERS' OPPOSITION TO AMAZON'S MOTION FOR
PRELIMINARY INJUNCTION (No. 12-01911-RAJ) - 20

5153RJB, 2011 WL 1485604 (W.D. Wash. 2011).

    <u>California Law Applies Absent a Choice of Law Clause</u>.  To determine which state has the most significant relationship to the contract under § 188, a court reviews the contacts with each interested jurisdiction, considers which are most significant, and the interests and public policies of the interested jurisdictions.  *Ito Int'l Corp. v. Prescott, Inc.*, 83 Wn. App. 282, 289, 921 P.2d 566 (1996).  Applying these principles requires more than counting contacts; a court must consider the interests and policies of each state and how they relate to the issue.  *Potlatch No. 1 Fed. Credit Union v. Kennedy*, 76 Wn.2d 806, 810-11, 459 P.2d 32 (1969).  Mr. Powers signed the NDA in Georgia (there was no negotiation).  The subject matter of the restrictions will occur in California, where Mr. Powers now lives and works for a California company.[22]

    **3.**    <u>**Amazon Has Not Established Likely Success on Its Trade Secret Claims**</u>.

    Amazon also is not likely to prevail on its claims of potential misappropriation of trade secrets.  It has not adequately identified the trade secrets with sufficient particularity as to separate them from matters of general knowledge in the trade or special knowledge of those skilled in the trade to meet its burden of proving that a legally protected secret exists.[23]  Vague, sweeping references to alleged trade secrets are inadequate to establish grounds for injunctive relief, particularly when contradicted by counter-affidavits.  *K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088-89 (9th Cir. 1972).  Nor, absent sufficient identification of the trade secrets at issue, does Amazon meet its burden to show such information as novel, and not known to or readily ascertainable by the industry.[24]  Lists of customers do not qualify as trade secrets if the

---

[22] Comment c to § 188 states that the purpose sought to be achieved by potentially interested states, and the relation of these states to the transaction, "are important factors to be considered in determining the state of most significant relationship."  So the state where a party to the contract is domiciled has an obvious interest in the application of its contract rule designed to protect that party against the unfair use of superior bargaining power.  Further, "a state may have little interest in the application of a statute designed to regulate or to deter a certain business practice if the conduct complained of is to take place in another state."  *Restatement* § 188 cmt. c.

[23] *See generally Boeing Co. v. Seirracin Corp.*, 108 Wn.2d 38, 49, 738 P.2d 665 (1987); *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wn.2d 427, 439, 971 P.2d 936 (1999); *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d at 1164-65.

[24] *Precision Moulding & Frame, Inc. v. Simpson Door Co.*, 77 Wn. App. 20, 26-27, 888 P.2d 1239 (1995) ("[A] plaintiff cannot establish that a trade secret exists if the information is generally known to or readily ascertainable by other persons . . . . within a given industry[.]"); *Ossur Holdings, Inc. v. Bellacure, Inc.*, No. C05-1552JLR, 2006 WL

POWERS' OPPOSITION TO AMAZON'S MOTION FOR
PRELIMINARY INJUNCTION (No. 12-01911-RAJ) - 21

Byrnes • Keller • Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

information is commonly known or available from other sources,[25] as Mr. Powers demonstrates is the case with AWS' customers.  Amazon shows no misappropriation by Mr. Powers, or likely success under an "inevitable disclosure" standard that Washington law has not endorsed, and which requires clear evidence of <u>actual misappropriation</u> of, or circumstances in which the employee at issue <u>must</u> rely, on his employer's trade secrets to perform his or her new job.[26]

## C. **Amazon Has Not Demonstrated Irreparable Injury.**

Amazon's motion also fails because it has not demonstrated that it is likely to suffer imminent, irreparable harm, i.e., harm which is not compensable by monetary damages or other legal remedies.  *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1202 (9th Cir. 1980) (monetary injury typically not irreparable).  Mere possibility of harm will not suffice; a plaintiff "must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *Alliance for the Wild Rockies*, 632 F.3d at 1131.  An injunction will not be granted based only on a "mere possibility of some remote future injury or a conjectural or hypothetical injury." *Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011) (citation omitted; internal quote marks omitted).

To meet this element, Amazon argues that Mr. Powers agreed to an injunction to enforce the agreement.  Mot. at 18:26.  But the NDA provides for an injunction only if Mr. Powers

---

2401269, at *2 (W.D. Wash. 2006) ("Washington courts also require novelty in order for particular information to qualify for trade secret protection."); *Buffets, Inc. v. Klinke*, 73 F.3d 965, 968 (9th Cir. 1996) (finding no novelty in plaintiff's recipes where by expenditure of effort defendant can collect the same information from public sources and holding that alleged secrets were "so obvious that very little effort would be required to 'discover' them").

[25] *Murphy Elecs., Inc. v. K. R. Anderson Co.*, No. 451723-I, 2000 WL 1279301, at *3 (Wash. Ct. App. 2000) (customer list is not trade secret if information is readily ascertainable from public sources, e.g., directories or phone books).

[26] *H&R Block E. Tax Servs., Inc. v. Enchura*, 122 F. Supp. 2d 1067, 1076 (W.D. Mo. 2000); *see also Desert Sun Net LLC v. Kepler*, C06-1041P, 2006 WL 3091170 (W.D. Wash. Oct. 27, 2006) (denying injunction where plaintiff claimed fear that defendants would disclose confidential information but submitted no evidence defendants acquired any customer data by improper means or disclosed or threatened to disclose such data); *EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 311 (S.D.N.Y. 1999) (rejecting inevitable disclosure because it "treads an exceedingly narrow path through judicially disfavored territory" and confirming that, "[a]bsent evidence of actual misappropriation by an employee, the doctrine should be applied in only the rarest of cases"); *Bridgestone/Firestone, Inc. v. Lockhart*, 5 F. Supp. 2d 667, 682 (S.D. Ind. 1998) (rejecting inevitable disclosure absent proof that employee took confidential information with him or disclosed trade secrets to new employer or that needed to do so to fulfill his new job).

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*violates* the agreement; here, Amazon fails to provide ***even one example*** where Mr. Powers has violated the NDA's nondisclosure or customer nonsolicitation clauses. Injunctive relief is prospective and requires proof of *current* violations. *Braam ex rel. Braam v. State*, 150 Wn.2d 689, 708, 81 P.3d 851 (2003). Amazon offers no authority that the Court may, based on a contract clause, presume irreparable harm. *See Riverside Publ'g Co. v. Mercer Publ'g LLC*, No. C11-1249RAJ, 2011 WL 3420421, at *8 (W.D. Wash. Aug. 4, 2011) (contract does not relieve plaintiff of burden to show irreparable harm). Moreover, the prospect of such injury is remote because of restrictions Google voluntarily imposed on Mr. Powers' work that go far beyond anything necessary to protect Amazon's customer relationships or confidential information.

Finally, Amazon makes no showing that it would suffer an *irreparable* injury, or that damages would be inadequate. It instead argues that the element of irreparable injury should be "presumed." Mot. at 17-18. Amazon cites no Ninth Circuit authority for such a presumption. *See Calence, LLC v. Dimension Data Holdings, PLC*, 222 F. App'x 563, 566 (9th Cir. 2007) (no error in "failing to presume irreparable harm" for trade secret misuse; lost revenues can be remedied through money damages). "[L]ost sales or business opportunities cannot constitute an *irreparable* harm, because […] even if they were difficult to calculate, they would still constitute monetary, measurable damages." *Mirina Corp. v. Marina Biotech*, 770 F. Supp. 2d 1153, 1162 (W.D. Wash. 2011). Amazon's cited authorities in support of such a presumption are from other circuits and predate two Supreme Court decisions that foreclose such a presumption. *See eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388 (2006); *Winter*, *supra*, 555 U.S. at 24. In *eBay*, the Court rejected the use of "categorical" rules presuming "irreparable harm" in patent infringement cases because such a rule "cannot be squared with the principles of equity adopted by Congress." *eBay,* 547 U.S. at 393. In *Winter*, the Court rejected a "possibility" of irreparable harm standard as "too lenient." *Winter*, 555 U.S. at 22. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

to such relief." *Id*.  Applying *eBay* and *Winter*, the Ninth Circuit overruled its prior cases approving a presumption of irreparable injury in copyright cases.  *See Flexible Lifeline Sys.*, 654 F.3d at 990.  Thus, there can be no presumption of irreparable injury in non-compete cases.

**D.    Equities Balance in Mr. Powers' Favor.**

The equities decidedly favor Mr. Powers.  Amazon seeks an injunction blocking him from using knowledge and skills selling Cloud products in the enterprise market honed for years before his short tenure at Amazon.  Conversely, absent injunctive relief, Mr. Powers is already subject to restrictions that more than adequately protect Amazon's *legitimate* interests.  Given projected 2012 revenue of $65-$67 billion, of which AWS revenues will be less than four percent (Powers Decl. ¶¶ 29-30), and no proof as to Mr. Powers' potential impact on them, there is no evidence that any losses Amazon might sustain would be of note.

**E.    Public Policy Is Not Served by Granting Amazon Injunctive Relief.**

There is no question but that California public policy is not served by granting Amazon injunctive relief.  Nor is Washington public policy served, as discussed above, in regard to enforceability of the NDA under Washington law.

## IV.    CONCLUSION

Amazon's motion for a preliminary injunction should be denied in its entirety.

DATED this 26th day of November, 2012.

BYRNES KELLER CROMWELL LLP

By /s/ Keith D. Petrak
    Keith D. Petrak, WSBA #19159
    Steve Minson, WSBA #30974
1000 Second Avenue, 38th Floor
Seattle, WA  98104
Telephone:  (206) 622-2000
Facsimile:  (206) 622-2522
kpetrak@byrneskeller.com
sminson@byrneskeller.com
***Attorneys for Defendant Daniel Powers***

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1

## CERTIFICATE OF SERVICE

2

3        The undersigned attorney certifies that on the 26th day of November, 2012, I
electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which
will send notification of such filing to the following counsel on record in this matter:

4

5        Ladd B. Leavens
         Jonathan M. Lloyd
6        Davis Wright Tremaine LLP
         1201 Third Avenue, Suite 2200
7        Seattle, WA  98101-3045

8                                                  /s/ Keith D. Petrak
                                                   Byrnes Keller Cromwell LLP
9                                                  1000 Second Avenue, 38th Floor
                                                   Seattle, WA  98104
10                                                 Telephone:  (206) 622-2000
                                                   Facsimile:  (206) 622-2522
11                                                 kpetrak@byrneskeller.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000