HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

AMAZON.COM, INC.,

            Plaintiff,

   v.

DANIEL A. POWERS,

            Defendant.

CASE NO. C12-1911RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on the motion of Plaintiff Amazon.com, Inc. ("Amazon") for a preliminary injunction against Defendant Daniel Powers.  Dkt. # 11. For the reasons stated below, the court GRANTS the motion in part and DENIES it in part.  The court enters a limited preliminary injunction in Part IV of this order.

## II.  BACKGROUND

### A.  Mr. Powers Worked at Amazon for Two Years.

Amazon hired Mr. Powers in mid-2010 to serve as a vice-president in its Amazon Web Services ("AWS") division.  Unlike the consumer-targeting online shopping services for which Amazon initially became known, AWS caters to businesses.  Mr. Powers was responsible for sales of Amazon cloud computing services.  His customers were businesses who wanted to use Amazon's vast network of computing resources for their own software development, data storage, web site hosting, and the like.  Mr. Powers

ORDER – 1

was a Washington resident based at Amazon's Seattle headquarters, although he traveled extensively for his job.

Mr. Powers left Amazon effective July 1, 2012.  No one disputes, however, that the last day on which he had access to any internal Amazon information was June 18, 2012.  Powers Decl. (Dkt. # 16) ¶¶ 15-16.  When he left Amazon, he took no documents in paper or electronic form.  *Id.* ¶ 16.  There is no evidence that, at the time of his departure, he had specific plans to work elsewhere.

**B.    Mr. Powers Signs Amazon's Noncompetition Agreement.**

When Mr. Powers started working at Amazon, he signed a "Confidentiality, Noncompetition and Invention Assignment Agreement."  Selipsky Decl. (Dkt. # 6), Ex. B ("Agreement").  The Agreement has four components that bear on this dispute.

The first component is a broad prohibition against Mr. Powers' disclosure of what the Agreement deems "Confidential Information."  Confidential Information includes, but is not limited to, the identity of Amazon's customers, "data of any sort compiled by [Amazon]," including marketing data and customer data, techniques for identifying prospective customers and communicating with prospective or current customers, current or prospective marketing or pricing strategies, plans for expansion of products or services, and "any other information gained in the course of the Employee's employment . . . that could reasonably be expected to prove deleterious to [Amazon] if disclosed to third parties . . . ."  Agr. ¶ 2(a)(i)-(xi).  Once an employee learns "Confidential Information," he can never disclose it to anyone.  Agr. ¶ 2(b)(i).  The only relevant exception is for information that is in the public domain.  Agr. ¶ 2(b)(ii).

The second component of the Agreement is a ban on Mr. Powers doing business with Amazon's customers or prospective customers for 18 months after his departure from Amazon.  Agr. ¶ 2(c)(ii).  The ban applies in any business relationship with an Amazon customer where Mr. Powers would provide a similar product or service to one

ORDER – 2

that Amazon provides. *Id.* More broadly, the ban applies to any relationship with an Amazon customer where the relationship "would be competitive with or otherwise deleterious to the Company's own business relationship or anticipated business relationship" with the customer. *Id.*

The third component is an 18-month ban on Mr. Powers working in any capacity that competes with Amazon. The ban prevents him from offering a product or service in any "retail market sector, segment, or group" that Amazon did business with or planned to do business with prior to his last day at Amazon, provided that the product or service he offers is "substantially the same" as one that Amazon provides. Agr. ¶ 3(c)(iii). Taken literally, the ban has extraordinary reach: it would, for example, prevent Mr. Powers from working for a bookseller, even though he had nothing to do with Amazon's book sales while he worked there.

The fourth component is a 12-month ban, measured from Mr. Powers' last day of employment, on hiring or employing former Amazon employees. Agr. ¶ 3(b).

When Mr. Powers left Amazon, he received a substantial severance payment and signed a severance agreement. The severance agreement reiterates his obligations under the Agreement, but changes none of them. Selipsky Decl., Ex. C. Amazon insists that it made the severance payment to reinforce the Agreement, but it offers little evidence to support that claim. It is just as likely that it paid Mr. Powers to settle disputes over his termination and Amazon stock he would have received if he had kept his job.

**C.   Mr. Powers Started Work at Google Three Months After He Left Amazon.**

Google, Inc., hired Mr. Powers in September 2012 to work as its Director of Global Cloud Platform Sales at its Mountain View, California headquarters. Powers Decl., Ex. C. As a result of this litigation, he now uses the title "Director, Google Enterprise," Nair Decl. (Dkt. # 17) ¶ 3, and he has agreed not to use a title that refers to cloud computing until the end of 2012. Petrak Decl. (Dkt. # 18), Ex. D.

ORDER – 3

Although Mr. Powers job at Google will resemble his job at Amazon in some respects, the extent of that similarity is difficult to gauge on this record. The parties agree that part of Mr. Powers' job will be to oversee sales of Google products that do not compete with AWS offerings. In part, however, Google intends that he oversee sales of its cloud computing services. Amazon has pointed to three specific Google products (Google App Engine, Google Cloud Storage, and Google Compute Engine) that compete with various AWS products. Selipsky Decl. ¶¶ 5, 23, 28-30. Amazon has provided relatively little information, however, that would permit the court to assess the nature of that competition. On this record, the court can only say that Google has a variety of cloud services that it hopes to sell in approximately the same market in which AWS operates. The parties dispute, for example, whether Google App Engine competes with any AWS product. There is little evidence that would permit the court to assess the extent to which Mr. Powers' experience marketing Amazon's products would be useful in marketing Google's competing products. According to Mr. Powers, Google's cloud services are sufficiently distinct from Amazon's that his experience with Amazon services will be of little use to him at Google. Powers Decl. ¶¶ 22-25.

**D.  Google Has Temporarily Restricted Mr. Powers' Cloud Computing Work.**

Before he began work on September 24, Google sent Mr. Powers a written job offer. The offer acknowledged his prior employment and imposed several restrictions. It stated that he was never to use or disclose any "confidential, proprietary, or trade secret information" of any prior employer. Powers Decl., Ex. C. It also restricted him from cloud computing work for his first six months at Google:

> [D]uring the first six months of your employment with Google, your activities will not entail participation in development of, or influencing, strategies related to product development in the areas of cloud compute, storage, database or content delivery networks products or services, other than to provide those involved in such matters with publicly available market research or customer feedback regarding Google's existing products generated after you commence work at Google.

ORDER – 4

*Id.* It also prevented him from working with his Amazon customers:

> During the first six (6) months from your last date of employment with your current employer, you and Google also agree that you will not participate, directly or indirectly, in sales or marketing to any customers of your prior employer that, to the best of you[r] memory, you had material direct contact or regarding whom you reviewed confidential information of your prior employer.

*Id.* It prohibited him from being "directly or indirectly involved in the hire of any current or former employee of your prior employer" for the twelve months following his departure from Amazon. *Id.*

When Amazon discovered that Mr. Powers had begun working at Google, it began discussions with Google about his new job. Google voluntarily disclosed Mr. Powers new responsibilities as well as the restrictions it had already imposed on his employment.

Google's voluntary restrictions did not satisfy Amazon. It sued Mr. Powers for breach of the Agreement (and the severance agreement) and violation of Washington's version of the Uniform Trade Secrets Act ("Trade Secrets Act," RCW Ch. 19.108). It also raised a claim for a breach of the common law duties of confidentiality and loyalty, although it does not mention that claim in the motion before the court. Amazon first sued in King County Superior Court and sought a temporary restraining order. Mr. Powers removed the case to this court in late October, before the state court took any action.

After the case arrived here, the parties negotiated in an attempt to reach an agreement that would permit them to fully brief a motion for a preliminary injunction, rather than battling over an expedited temporary restraining order. They ultimately agreed that, until the end of 2012, Mr. Powers would comply with the terms of Google's offer letter, that he would refrain from sales, marketing, or strategy for a specific list of Google products and services, that he would not solicit Amazon Web Services customers who he worked with or about whom he had confidential information, and that his title at

ORDER – 5

1    Google would not refer to cloud computing.[1]  Petrak Decl., Ex. D.  Mr. Powers offered to

2    participate in expedited discovery in advance of a preliminary injunction motion.  *Id.*

3    Amazon refused.  *Id.*

4          Amazon asks for a five-part injunction.  Proposed Injunction (Dkt. # 11-1) at 7-8.

5    It would prohibit Mr. Powers from disclosing Amazon's confidential information or trade

6    secrets.  *Id.* at 7.  It would prevent him from engaging in "any activity that directly or

7    indirectly supports any aspect of Google's cloud computing business that competes with

8    Amazon's cloud computing business," including but not limited to the three specific

9    Google products that allegedly compete with Amazon cloud products.  *Id.*  He would not

10   be able to solicit "any customer or prospect of Amazon's cloud computing business with

11   whom he had direct contact or regarding whom he received confidential information

12   while employed by Amazon."  *Id.*  He would not be able to solicit or recruit any "current

13   Amazon employees."  *Id.*  Finally, the injunction would require him to return anything

14   that he took from Amazon.

15                              **III.  ANALYSIS**

16         The court may issue a preliminary injunction where a party establishes (1) a

17   likelihood of success on the merits, (2) that it is likely to suffer irreparable harm in the

18   absence of preliminary relief, (3) that the balance of hardships tips in its favor, and (4)

19   that the public interest favors an injunction.  *Winter v. Natural Resources Defense*

20   *Council, Inc.*, 555 U.S. 7, 20 (2008).  A party can also satisfy the first and third elements

21   of the test by raising serious questions going to the merits of its case and a balance of

22

23

24   _____
     [1] Before Amazon objected to Mr. Powers' employment at Google, Google voluntarily kept him
25   from working in cloud computing until six months after his employment began, or about the end
     of March 2013.  Amazon's negotiation for restrictions in connection with this litigation led
26   Google to promise no restrictions beyond the end of 2012.  It is not clear whether Google will
     continue its restrictions beyond the end of this year; in any event, Google's choice would not
27   impact the court's decision today.

28   ORDER – 6

hardships that tips sharply in its favor. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).[2]

With this standard in mind, the court quickly eliminates two aspects of the injunction Amazon requests. The first is a prohibition on Mr. Powers "[s]oliciting or recruiting any current Amazon employees."[3] Proposed Injunction (Dkt. # 11-1) at 7. There is no evidence that Mr. Powers has attempted to recruit Amazon employees. There is no evidence that he intends to do so. Google has already forbidden him to do so for the first 12 months following his departure from Amazon. This is, probably not coincidentally, the same 12-month restriction the Agreement imposes on Mr. Powers. On this record, no one could conclude that it is likely that Mr. Powers will solicit Amazon employees, and no one could conclude that Amazon will suffer any harm, much less irreparable harm.

Similarly, the court cannot impose an injunction that requires Mr. Powers to return all Amazon "property, documents, files, reports, work product, and/or other materials . . . ." Proposed Injunction (Dkt. # 11-1) at 8. There is not a shred of evidence that Mr. Powers has any Amazon documents or anything else belonging to Amazon. Mr. Powers denies that he took anything from Amazon when he left. Powers Decl. ¶ 16. Amazon has not even raised serious questions going to the merits of this claim.

---

[2] *Winter* overruled Ninth Circuit law that permitted a party to obtain a preliminary injunction merely by proving a "possibility" of irreparable harm. 555 U.S. at 22. Ninth Circuit panels initially raised questions over the scope of the *Winter* ruling. *See Shepherd v. Weldon Mediation Servs., Inc.*, 794 F. Supp. 2d 1173, 1176-77 (W.D. Wash. 2011) (reviewing cases). It now appears settled that *Winter* did not "change the requisite showing for any individual factor [in the preliminary injunction analysis] other than irreparable harm." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1187 (9th Cir. 2011).

[3] Amazon asked for an injunction that would prohibit Mr. Powers from "[s]oliciting or recruiting" Amazon employees. The Agreement, by contrast, is much more broad. It would prohibit Mr. Powers (and arguably Google itself) from employing any Amazon employee, regardless of who (if anyone) solicited or recruited the employee to work at Google. Amazon's insistence that the Agreement imposes "narrow" restrictions is frequently at odds with the language of the Agreement.

ORDER – 7

**A.    Amazon is Not Likely to Succeed on the Merits of Its Claims Regarding Disclosure of Its Confidential Information or Trade Secrets.**

The court's observation that there is no evidence that Mr. Powers took any documents from Amazon is a good place to begin its evaluation of the proposed injunction's restrictions on disclosure.  If Mr. Powers took any confidential or trade secret information from Amazon, he took it in his memory alone.

The sole evidence Amazon offers to support its claim that Mr. Powers remembers its confidential information is the declaration of Adam Selipsky, Mr. Powers' supervisor at Amazon.  Selipsky Decl. ¶¶ 9-17.  Although Mr. Selipsky asserts that Mr. Powers "knows" things about Amazon, he does not acknowledge that he can only speculate about what Mr. Powers knows now, more than six months after the last day he had access to any internal Amazon information.  Amazon declined the opportunity to engage in discovery that would have at least allowed it to determine what Mr. Powers still knows.

Mr. Selipsky shows that it is likely that Mr. Powers does not know much of the "secret" information Amazon is concerned about.  Mr. Selipsky cannot be certain that Mr. Powers *ever* knew some of that information.  For example, he contends that Mr. Powers' knowledge about Amazon customers is not limited to customers with whom he had contact, because he had "access to Amazon's confidential and highly detailed customer relationship management database."  Selipsky Decl. ¶ 12.  Mr. Selipsky does not say that Mr. Powers ever used this database.  He does not explain how, even if Mr. Powers used the database, he could remember data he gleaned from it at least six months ago.  He declares that Mr. Powers received a weekly report with "hundreds of pages worth of detailed business statistics for AWS as a whole and for its individual products and services . . . ."  *Id.* ¶ 15.  It is not likely that Amazon will prove at trial that Mr. Powers remembers more than a sliver of the information contained in hundreds of pages.

It is likely that Mr. Powers remembers something from his time at Amazon.  He no doubt remembers many of the customers with whom he dealt directly, and probably

ORDER – 8

remembers significant details of the relationships between those customers and Amazon. He probably remembers more, but the court declines to speculate.  Amazon had both the burden to provide evidence of what Mr. Powers knows and the opportunity to take discovery to get additional evidence.  That it has not done so, even as Google and Mr. Powers have given ample time to pursue discovery by voluntarily imposing virtually every restriction Amazon seeks in its injunction, is a damaging blow to Amazon's effort to demonstrate a likelihood of success on the merits.

Not only does the court not know what Mr. Powers remembers, the court does not know whether what he remembers is useful.  AWS apparently conducts "formal operations planning processes" every six months, during which AWS departments give "detailed presentations" on plans, strategy, and budget.  Selipsky Decl. ¶ 16.  Amazon excluded Mr. Powers from the AWS meetings that happened this past summer.  Powers Decl. ¶ 15.  Assuming that Mr. Powers attended the meetings six months prior (there is no direct evidence that he did), that means that the strategic information Mr. Powers acquired, if he remembers it, is at least a year old.  Mr. Selipsky emphasizes weekly emails and reports that Mr. Powers received (Selipsky Decl. ¶ 17), which serves equally well to emphasize that Mr. Powers has had no access to this weekly material for at least 27 weeks.  Perhaps Amazon's cloud computing business is structured so that even information that is as much as a year old remains competitively sensitive, but again, the court can only speculate.  Putting aside Mr. Powers' relationships with Amazon customers, Amazon has provided no compelling evidence that Mr. Powers still remembers competitively sensitive information he learned at Amazon.

Relying on this hazy evidence of what Mr. Powers knows, Amazon invokes the Agreement's non-disclosure provisions and the Trade Secrets Act to prevent Mr. Powers from revealing his knowledge.  For several reasons, Amazon is not likely to succeed in this effort, at least on the record before the court.

ORDER – 9

1       Amazon is not likely to prevail on its trade secret claim.  First, with the possible

2    exception of confidential information relating to its cloud computing customers, Amazon

3    has not identified any trade secrets that Mr. Powers currently knows.  *See Ed Nowogroski*

4    *Ins., Inc. v. Rucker*, 971 P.2d 936, 942 (Wash. 1999) ("A plaintiff seeking damages for

5    misappropriation of a trade secret . . . has the burden of proving that legally protectable

6    secrets exist.").  Amazon did not ask to file any evidence under seal, suggesting that it

7    believes the court will divine what information is a trade secret from Mr. Selipsky's

8    public declaration.  Having scoured that declaration, the court is unable to do so.  The

9    court acknowledges that it is likely that Mr. Powers learned information that would

10   qualify as a trade secret while he was at Amazon.  *See* RCW § 19.108.010(4) (defining

11   trade secret as a information that derives "independent economic value" from being

12   neither known nor readily ascertainable and that is subject to reasonable efforts to

13   maintain its secrecy).  But if there is trade secret information that Mr. Powers could still

14   be expected to know, Amazon has not identified it.

15       The possible exception is trade secret information about Amazon's customers.

16   Mr. Powers admits that he worked closely with 33 AWS customers.  Powers Decl. ¶ 21.

17   The *identity* of those customers is likely not a secret.  Mr. Powers' unrebutted evidence

18   shows that Amazon publicly identifies all of those entities as Amazon customers.  *Id.*

19   Although a customer list can be a trade secret, *see Ed Nowogroski Ins.*, 971 P.2d at 440,

20   Amazon has not identified a customer list or subset of a customer list that qualifies as a

21   trade secret.  It is possible, however, that Mr. Powers remembers trade secret information

22   about Amazon's relationships with those customers.  In contrast to the enormous sets of

23   AWS data that Amazon speculates Mr. Powers still remembers, it is far more likely that

24   he remembers information pertaining to these relatively few customers.

25       Even if Mr. Powers knows trade secret information about Amazon's relationship

26   with a few customers, Google has not identified what that information is.  As the court

27
28   ORDER – 10

will discuss later, Washington law permits noncompetition agreements that prevent an employee from trading unfairly on customer relationships he or she built before leaving employment. An employer cannot weave a similar restriction from a nondisclosure agreement or the Trade Secret Act without identifying confidential or trade secret information with sufficient specificity. Amazon has failed to do so here. Indeed, Amazon has not identified even one of the customers about which it is so concerned, much less any specific confidential information Mr. Powers knows about that customer.

Amazon's claims based on the nondisclosure clauses of the Agreement fail for the same reasons as its trade secret claim. Amazon has not discharged its burden to identify confidential information that Mr. Powers *still* knows and is still competitively useful.

Even if Amazon had sustained its burden to identify confidential or trade secret information that Mr. Powers knows, it would still need to prove a threat of irreparable harm. Evidence of what Mr. Powers knows is not enough; Amazon also needs evidence that Mr. Powers is likely to disclose it. That Mr. Powers knows something is not proof that he will use that knowledge at Google. Google has already forbidden him to ever use Amazon's confidential information. Amazon's counsel conceded at oral argument that Amazon has no evidence that Mr. Powers has disclosed anything in the nearly three months since he began working at Google. Once Google lifts its self-imposed restrictions on Mr. Powers' work with its cloud computing products, Mr. Powers may have more opportunity to use what he knows about Amazon. It is that possibility that garners much of Amazon's attention. Amazon has generally failed to point to anything specific that Mr. Powers knows that he is likely to disclose at Google. It instead asserts that virtually everything Mr. Powers knows is confidential and that because of the nature of his job at Google, he must inevitably use or disclose that knowledge in his work there. Mr. Powers decries Amazon's approach as an impermissible "inevitable disclosure" argument.

ORDER – 11

Amazon has not proffered evidence from which the court can conclude that it is likely that Mr. Powers will "inevitably disclose" Amazon's confidential information. The parties debate whether Washington has ever recognized inevitable disclosure as a viable basis for a trade secret or breach of confidentiality claim. On this record, that debate is largely beside the point. The crux of an inevitable disclosure argument in this context is a showing that an employee's new job so closely resembles her old one that it would be impossible to work in that job without disclosing confidential information. Amazon has not made that showing here. It has pointed to a host of at least superficial similarities between Mr. Powers' old job and his new one, including a set of superficial similarities between Google's App Engine, Cloud Storage, and Compute Engine services and comparable AWS offerings. This effort falls short of convincing the court that Mr. Powers cannot do his new job without relying on Amazon's confidential information.

The court emphasizes the high bar for an inevitable disclosure argument for two reasons. First, if an employer cannot make a detailed showing of similarity between an employee's new job and old job, then it can hardly argue that disclosure is inevitable. Amazon's inevitable disclosure argument fails in this case for at least that reason. More importantly, however, an employer may lawfully prohibit an employee from *ever* disclosing its confidential information. Were inevitable disclosure as easy to establish as Amazon suggests in its motion, then a nondisclosure agreement would become a noncompetition agreement of infinite duration. As the court will now discuss in its analysis of the noncompetition clauses of the Agreement, Washington law does not permit that result.

**B.   With the Exception of Restrictions on Work with Former Customers, Amazon is Not Likely to Succeed on the Merits of Its Effort to Enforce the Noncompetition Clauses in the Agreement.**

The Agreement contains a choice-of-law clause selecting Washington law, under which an agreement that restricts a former employee's right to compete in the

ORDER – 12

marketplace is enforceable only if reasonable.  The court will consider Mr. Powers' effort to avoid the choice-of-law clause in Part III.C.  For now, the court applies Washington law, under which a court deciding whether a noncompetition agreement is reasonable must consider three factors:

> (1) whether restraint is necessary for the protection of the business or goodwill of the employer, (2) whether it imposes upon the employee any greater restraint than is reasonably necessary to secure the employer's business or goodwill, and (3) whether the degree of injury to the public is such loss of the service and skill of the employee as to warrant nonenforcement of the covenant.

*Perry v. Moran*, 748 P.2d 224, 228 (Wash. 1987).  If a court finds a restraint unreasonable, it can modify the agreement by enforcing it only "to the extent reasonably possible to accomplish the contract's purpose."  *Emerick v. Cardiac Study Ctr., Inc.*, 286 P.3d 689, 692 (Wash. Ct. App. 2012).  Among other things, the court can reduce the duration of an unreasonably long anticompetitive restriction.  *See*, *e.g.*, *Perry*, 748 P.2d at 231 ("It may be that a clause forbidding service [to former clients] for a 5-year period is unreasonable as a matter of law . . . ."); *Armstrong v. Taco Time Int'l, Inc.*, 635 P.2d 1114, 1118-19 (Wash. Ct. App. 1981) (cutting five-year restriction to two and a half years).  In any case, the court should protect an employer's business only "as warranted by the nature of [the] employment."  *Emerick*, 286 P.3d at 692.

Applying these principles, Washington courts have typically looked favorably on restrictions against working with an employee's former clients or customers.  In *Perry*, the court upheld a 20-accountant firm's noncompetition agreement preventing a departing employee from working with her former clients for about a year and a half after she left the firm.[4]  748 P.2d at 224.  The court recognized the employer's "legitimate interest in protecting its existing client base," and rejected the notion that lesser restrictions, like one

---

[4] As written, the restrictive covenant in *Perry* would have lasted five years. 748 P.2d at 225.  At trial, however, the employer sought to enforce it solely as to the year and a half between the employee's departure and trial.  *Id.* at 231.  For that reason, the court declined to decide whether a five-year restriction was too long.  *Id.* at 230-31.

ORDER – 13

that would only prohibit the former employee from soliciting (as opposed to working with) former clients, would be adequate to protect that interest. *Id.* at 229. Generally speaking, time-limited restrictions on business with former clients or customers survive scrutiny in Washington. *See*, *e.g.*, *Knight, Vale & Gregory v. McDaniel*, 680 P.2d 448, 451-52 (Wash. Ct. App. 1984) (declining to invalidate three-year restriction on accountant working with former clients); *Pac. Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1205, 1218 (E.D. Wash. 2003) (finding two-year restriction on solicitation of former customers to be reasonable as a matter of law); *Seabury & Smith, Inc. v. Payne Fin. Group, Inc.*, 393 F. Supp. 2d 1057, 1063 (E.D. Wash. 2005) (finding one-year restriction on working with former clients to be reasonable as a matter of law); *see also Labor Ready, Inc. v. Williams Staffing, LLC*, 149 F. Supp. 2d 398, 408 (N.D. Ill. 2001); (applying Washington law, upholding one-year ban on working with former customers).

Washington courts have been more circumspect when considering restrictions that would prevent an employee from taking on any competitive employment. These general restrictions on competition are more suspect than mere bans on working with former clients or customers. *Perry*, 748 P.2d at 230. Courts will in some circumstances enforce general noncompetition restrictions when they apply only in a limited geographical area. *See*, *e.g. Emerick*, 286 P.3d at 693-95 (remanding for reconsideration of necessity of five-year ban on competitive employment in a single county); *Hometask Handyman Servs., Inc. v. Cooper*, No. C07-1282RSL, 2007 U.S. Dist. LEXIS 84708, at *10-11 (W.D. Wash. Oct. 30, 2007) (granting injunction against former franchisee based on general competition restriction, but reducing area from 100-mile radius to 25-mile radius); *see also Labor Ready*, 149 F. Supp. 2d at 408 (N.D. Ill. 2001) (upholding one-year general bar on competition within 10-mile radius of former employer). Courts have also declined to enforce even geographically limited general restrictions on competition. *See A Place for Mom, Inc. v. Leonhardt*, No. C06-457P, 2006 U.S. Dist. LEXIS 58990, at *6-7, 13-14

ORDER – 14

(W.D. Wash. Aug. 4, 2006) (declining to issue injunction based on general restriction on competitive employment).

When a noncompetition agreement is targeted at a competing business, rather than an individual employee, specific circumstances can justify a general bar on competition. For example, in *Oberto Sausage Co. v. JBS S.A.*, C10-2033RSL, 2011 U.S. Dist. LEXIS 33077 (W.D. Wash. Mar. 11, 2011), the court considered a meat retailer's request for a pre-arbitration injunction against a Brazilian meat processor who had formerly supplied meat exclusively to the retailer. In that case, the retailer had worked closely with the Brazilian processor to teach its proprietary beef jerky manufacturing process. *Id.* at *3. When one of its chief competitors purchased the Brazilian processor, the court enforced a general restriction on competition within the United States, preventing its competitor from "taking a free ride on its substantial investment in training [Brazilian] employees and upgrading the [Brazilian plant] with equipment plaintiff claims it developed through its confidential research and development." *Id.* at *18. The court imposed the injunction only for the length of time it took the parties to present their dispute to an arbitrator. *Id.* at *22. Similarly, in *Armstrong*, the court upheld a restriction on a former franchisee opening competing restaurants near the franchisor's restaurants, but it cut the five-year duration of the restriction in half. 635 P.2d at 1118-19.

The court distills a few general principles from these cases. First, Washington courts are relatively deferential to employers in enforcing agreements restricting a former employee's work with the employer's clients or customers. Courts are less deferential to general restrictions on competition that are not tied to specific customers. An employer can demonstrate that more general restrictions are necessary, but can do so only by pointing to specific information about the nature of its business and the nature of the employee's work. Finally, although courts are somewhat deferential about the duration or geographic extent of noncompetition agreements, they will readily shorten the duration

ORDER – 15

or limit the geographic scope, especially where the employer cannot offer reasons that a longer or more expansive competitive restriction is necessary. With these principles in mind, the court considers the Agreement's 18-month restriction on working with former Amazon customers and its 18-month general noncompetition clause.

The Agreement passes muster under Washington law to the extent it seeks to prevent Mr. Powers from working with his former Amazon customers. Mr. Powers, no less than the employees in *Perry*, *Knight*, and in other Washington cases, competes unfairly with Amazon to the extent he attempts to trade at Google on customer relationships he built at Amazon. The reasonable duration of that restriction, however, is a matter of dispute. This is not a case where Mr. Powers seeks to leap from Amazon immediately to Google with his former customers in tow. He stopped working with Amazon customers more than six months ago. There is no evidence he has had contact with any of them since then. There is no direct evidence that he intends to pursue business with any of them. The only indirect evidence that he has interest in contacting his former customers is that he has chosen to fight Amazon's efforts to enforce the Agreement. Although the personal aspects of his relationships with his former customers might be expected to endure for more than six months, they might just as well extend even beyond the 18-months that the Agreement provides. Amazon has not explained why it selected an 18-month period, nor has it disputed Mr. Powers' suggestion that the Agreement he signed is a "form" agreement that Amazon requires virtually every employee to sign. Because Amazon makes no effort to tailor the duration of its competitive restrictions to individual employees, the court is not inclined to defer to its one-size-fits-all contractual choices. Amazon has not convinced the court that the aspects of Mr. Powers' relationships with customers that depend on confidential Amazon information are still viable today. On this record, the court finds it would not be

ORDER – 16

reasonable to enforce the Agreement's customer-based restrictions for longer than nine months from the last date on which Mr. Powers had access to Amazon's information.

The Agreement's general noncompetition clause, in contrast to the clause targeting Amazon customers, is not reasonable.  Amazon asks the court to prevent Mr. Powers from working in a competitive capacity anywhere in the world.  The court is willing to assume, even though Amazon has provided no evidence, that the cloud computing business in which Google and Amazon compete is geographically far-flung.  Because both companies compete globally, it is possible that Mr. Powers could inflict competitive injury on Amazon even while working a thousand miles from his Seattle-based former employer.  But even if the court accepts the extraordinary geographic reach of the ban, it could not accept Amazon's implicit argument that it is impossible for Mr. Powers to compete fairly with Amazon in the cloud computing sector.

Amazon has failed to articulate how a worldwide ban on cloud computing competition is necessary to protect its business.  Its ban on working with former customers serves to protect the goodwill it has built up with specific businesses.  A general ban on Mr. Powers' competing against Amazon for other cloud computing customers is not a ban on *unfair* competition, it is a ban on competition generally.  Amazon cannot eliminate skilled employees from future competition by the simple expedient of hiring them.  To rule otherwise would give Amazon far greater power than necessary to protect its legitimate business interest.  No Washington court has enforced a restriction that would effectively eliminate a former employee from a particular business sector.  This court will not be the first, particularly where Amazon has not provided enough detail about the nature of AWS's cloud computing business to convince it that an employee like Mr. Powers can only compete with AWS by competing unfairly.

Much of Amazon's argument in favor of enforcement of its general restriction on competition is cribbed from the inevitable disclosure argument it advanced in support of

ORDER – 17

1  the Agreement's nondisclosure provisions.  According to Amazon, Mr. Powers simply

2  knows too much to compete fairly with Amazon in the cloud computing sector.  The

3  court finds these claims to be fatally nonspecific, as it explained in Part III.A.

4  Generalized claims that a former employee cannot compete fairly are insufficient.  *See*

5  *Copier Specialists, Inc. v. Gillen*, 887 P.2d 919, 920 (Wash. Ct. App. 1995) (finding that

6  the "training [an employee] acquired during his employment, without more," did not

7  warrant enforcement of a geographically limited covenant not to compete).  Before

8  enforcing a general restriction against competition, the court would require a far more

9  specific showing than Amazon has made here.[5]

10  **C.   Washington Law, not California Law, Applies to Amazon's Claims Based on the Agreement.**

11  

12      The court briefly addresses Mr. Powers' contention that California law, not

12  Washington law, should apply to this dispute.  The court considers that contention only as

13  it applies to Amazon's claims based on the Agreement.  No one has articulated a choice-

14  of-law argument as applied to Amazon's Trade Secret Act claim, and the court need not

15  consider that issue in light of its disposition today.

16      Because the court exercises diversity jurisdiction in this case, it applies

17  Washington's choice-of-law rules.  *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002).

18  The threshold question in a Washington choice-of-law analysis is whether there is an

19  actual conflict with another state's law.  *Burnside v. Simpson Paper Co.*, 864 P.2d 937,

20  942 (Wash. 1994); *see also Alaska Nat'l Ins. Co. v. Bryan*, 104 P.3d 1, 5 (Wash. Ct. App.

21  2004) (placing burden on party favoring another state's law to establish conflict with

22  Washington law).  The court assumes without deciding that Mr. Powers correctly asserts

23  that even the Agreement's restrictions on working with former customers would be

24  unenforceable under California's more pro-employee approach to noncompetition

---

[5] The court's disposition today makes it unnecessary to resolve Mr. Powers' contention that the noncompetition clause in the Agreement applies only to retail markets for consumer goods, and thus has no application to the sale of cloud computing services to businesses.

ORDER – 18

1   agreements.  *See*, *e.g.*, *Google, Inc. v. Lee*, 415 F. Supp. 2d 1018, 1022 (N.D. Cal. 2005)

2   (comparing Washington and California law).  Amazon does not argue otherwise.

3          Having identified a conflict of law, Washington choice-of-law rules require the

4   court to consider the Agreement's choice of Washington law. Agr. ¶ 9.  Washington

5   courts apply § 187 of the Restatement (Second) Conflict of Laws ("§ 187") when

6   resolving "conflict of laws problems in which the parties have made an express

7   contractual choice of law."  *Erwin v. Cotter Health Ctrs.*, 167 P.3d 1112, 1120-21 (Wash.

8   2007).  In relevant part, § 187 requires the court to enforce the parties' contractual choice

9   of law unless "the chosen state has no substantial relationship to the parties or the

10  transaction and there is no other reasonable basis for the parties' choice," § 187(2)(a), or

11  "the application of the law of the chosen state would be contrary to a fundamental policy

12  of a state which has a materially greater interest than the chosen state in the determination

13  of the particular issue and which, under the [Restatement (Second) Conflict of Laws,

14  § 188], would be the state of the applicable law in the absence of an effective choice of

15  law by the parties," § 187(2)(b).  No one argues that Washington lacks a substantial

16  relationship to Mr. Powers, Amazon, and the Agreement.  For that reason, Mr. Powers'

17  plea for the application of California law requires him to, among other things, show that

18  California has a "materially greater interest" than Washington in determining the

19  enforcement of the Agreement.

20         California's interest in the enforcement of the Agreement is no greater than

21  Washington's.  Washington's willingness to enforce anticompetitive restrictions reflects a

22  strong interest in protecting its businesses from unfair competition from former

23  employees.  California likely has a strong interest in protecting its workers from attempts

24  by their former employers to limit their employment.  Nothing, however, would permit

25  the court to conclude that California's interest is "materially greater," especially as

26  applied in this dispute.  One court within this District has enforced a Washington choice-

27

28  ORDER – 19

of-law clause against employees *who lived and worked in California* when they signed a restrictive agreement with their Washington employer.  *CH2O, Inc. v. Bernier*, No. C11-5153RJB, 2011 U.S. Dist. LEXIS 42025, at *2-3, *20-24 (W.D. Wash. Apr. 18, 2011).  In this case, Mr. Powers had no idea when he signed the Agreement that he would one day seek work in California, and thus no reason to expect that California law would apply.  That he has now emigrated to California does not give California a materially greater interest in the outcome of this dispute.  In circumstances like these, the court is aware of no court applying Washington's choice-of-law rules that has concluded that California's interest in protecting its employees materially outweighs Washington's interest in providing limited protection to its employers.

**D.**     **Amazon Has Made a Sufficient Showing on the Remaining Injunctive Relief Factors to Justify a Limited Injunction.**

On this record, Amazon is likely to succeed on the merits only of its claim based on the Agreement's restrictions on working with former customers, although only for nine months.  The court now considers whether Amazon has demonstrated a likelihood of irreparable harm, where the balance of hardships tilts, and the public interest.

Irreparable harm is a likely consequence of permitting an employee to pursue his former customers in violation of a valid restriction.  The monetary damage from loss of a customer is difficult to quantify, and the damage to goodwill even more so.  There is no direct evidence that Mr. Powers intends to solicit former Amazon customers.  Given his opposition to Amazon's motion, however, the court finds it likely that he would approach at least some customers (or some customers would approach him) if neither Google nor this court prevents him from doing so.

In the context of this limited injunction, the balance of hardships favors Amazon.  Before Amazon even learned of Mr. Powers' work at Google, Google was willing to keep Mr. Powers from cloud computing work until six months after he began working at Google.  That self-imposed restriction would have expired in late March 2013.  Given

ORDER – 20

that Google was willing to impose that restriction and Mr. Powers was willing to accept it, the court finds no hardship to Mr. Powers in enforcing the Agreement's more limited customer-based restrictions until March 19, 2013, nine months after Mr. Powers' last had access to Amazon information.

The public interest does not weigh heavily in favor of either party. There is no evidence that the court's decision on this injunction will impact the public.

## IV.  PRELIMINARY INJUNCTION

For the reasons stated above, the court enters the following preliminary injunction. Until March 19, 2013, unless the court orders otherwise, Defendant Daniel Powers may not directly or indirectly assist in providing cloud computing services to any current, former, or prospective customer of Amazon about whom he learned confidential information while working at Amazon. "Confidential information" has the definition the parties gave it in the Agreement.

Given the brief duration of the injunction, Google is unlikely to suffer significant financial harm. For that reason, the court will require Amazon to obtain a $100,000 bond or deposit $100,000 into the court's registry. *See* Fed R. Civ. P. 65(c) (requiring security "in an amount that the court considers proper to pay the costs and damages sustained by any part found to have been wrongfully enjoined"). This injunction will take effect upon Amazon's notice of a bond or cash deposit.

## V.  CONCLUSION

For the reasons stated above, the court GRANTS in part and DENIES in part Amazon's motion for a preliminary injunction. Dkt. # 11.

DATED this 27th day of December, 2012.

_Richard A Jones_

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 21